[Cite as *State v. Bierma*, 2024-Ohio-2089.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29912 |
| | : | |
| v. | : | Trial Court Case No. 2021 CR 02094 |
| | : | |
| SARAH BIERMA | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on May 31, 2024

. . . . . . . . . . .

CHIMA R. EKEH, Attorney for Appellant

MATHIAS H. HECK, JR., by SARAH H. CHANEY, Attorney for Appellee

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Appellant, Sarah Bierma, appeals from her convictions in the Montgomery County Court of Common Pleas following a bench trial; Bierma was found guilty of two counts of felony murder, two counts of felonious assault, and single counts of aggravated burglary, aggravated robbery, and tampering with evidence. Although the trial court merged several of those counts at sentencing, in support of her appeal, Bierma claims

that the trial court erred by failing to merge the counts of aggravated burglary and felony murder. Bierma also claims that the trial court's finding that the State had satisfied its burden to disprove her claim of self-defense beyond a reasonable doubt was against the manifest weight of the evidence. For the reasons outlined below, we disagree with Bierma's claims and will affirm her convictions.

**Facts and Course of Proceedings**

{¶ 2} On July 1, 2021, a Montgomery County grand jury returned a seven-count indictment charging Bierma with the following offenses:

- felonious assault (deadly weapon), R.C. 2903.11(A)(2);

- felonious assault (serious physical harm), R.C. 2903.11(A)(1);

- felony murder (proximate cause felonious assault with a deadly weapon), R.C. 2903.02(B);

- felony murder (proximate cause felonious assault causing serious physical harm), R.C. 2903.02(B);

- aggravated burglary (physical harm), R.C. 2911.11(A)(1);

- aggravated robbery (serious physical harm), R.C. 2911.01(A)(3);

- tampering with evidence (alter/destroy), R.C. 2921.12(A)(1).

{¶ 3} The indicted charges stemmed from allegations that on June 19, 2021, Bierma stabbed Kendall Combs 56 times with scissors, shoved the scissors into his neck, and then strangled him with his belt while they were at Combs's residence in the city of Riverside, Montgomery County, Ohio. At her arraignment, Bierma stood mute and the

trial court entered a plea of not guilty on her behalf. Thereafter, Bierma indicated that she was pleading not guilty by reason of insanity and filed a motion requesting a competency examination. In response to Bierma's motion, the trial court ordered the Forensic Psychiatry Center for Western Ohio ("FPCWO") to perform competency and sanity evaluations on Bierma and return its findings to the court. Based on the reports generated by the FPCWO, the trial court found that Bierma was incompetent to stand trial but that there was a substantial probability she could be restored to competency within the statutory time limits if she received treatment. The trial court thereafter ordered Bierma to be committed to Summit Behavioral Healthcare for restoration treatment. After receiving treatment for six months, Bierma was evaluated again and determined to be competent to stand trial.

{¶ 4} Following the trial court's competency determination, Bierma filed a motion to suppress, which the trial court denied after holding two suppression hearings. Bierma thereafter filed a jury waiver and a notice of intent to argue self-defense at trial. Bierma's case then proceeded to a two-day bench trial. The following is a summary of the evidence presented at Bierma's trial.

*Combs and the Discovery of his Body*

{¶ 5} In June 2021, Combs was 60 years old and living by himself in a house in Riverside. Combs suffered from pancreatitis and a heart condition that required him to undergo heart valve surgery. These health conditions prevented Combs from doing a lot and caused him to be on disability.

**{¶ 6}** Combs's niece, Katherine Heizer, was the payee for Combs's disability benefits. Heizer ensured that all of Combs's bills were paid and that Combs had everything he needed. Prior to the COVID-19 epidemic, Heizer visited Combs twice a week in person. After COVID, Heizer began checking on Combs primarily by telephone. Heizer felt this was necessary because she worked as a nurse on a COVID unit at Miami Valley Hospital and did not want to get Combs sick. Heizer would call Combs to see if he needed anything and then drop off what he needed on his porch.

**{¶ 7}** On Sunday, June 20, 2021, Heizer became concerned about Combs. On that day, Heizer received a warning from her cell phone carrier, Verizon, saying that her cell phone data was almost gone. After some quick research, Heizer learned that the data was being used by Combs's cell phone, which was on her family plan. Heizer found this odd because Combs was usually very respectful about not using their cell phone data.

**{¶ 8}** After learning about the data usage, Heizer tried to call and text message Combs to tell him to stop using their data and to get on his Wi-Fi. Combs did not answer Heizer's call or respond to her text message. Because it was unusual for Combs not to respond to Heizer, Heizer went over to Combs's house the same day. When Heizer arrived at Combs's house, Heizer saw that Combs's black pickup truck was in the driveway, but Combs did not answer the door when Heizer knocked. Believing that Combs was sleeping, Heizer left.

**{¶ 9}** The next day, Heizer received a telephone call from Combs's next-door neighbor, Millard Hall, who expressed concern about Combs. Hall and Combs's across-

the-street neighbor, Kathleen Countiss, had not seen Combs since Saturday, June 19. On that Saturday, Countiss had observed Combs arrive at his residence in his pickup truck with a female companion. Countiss, who had lived in the area since 1966 and who had known Combs since he was a child, had never seen Combs with a female other than his relatives. Finding it odd that Combs had a female companion, Countiss called Hall, who knew Combs better, and asked if Combs had a girlfriend. Hall told Countiss that he did not know of any girlfriend. While speaking with Countiss over the phone, Hall looked out his window and reported to Countiss that he could see the female standing in Combs's backyard drinking a beer.

{¶ 10} After Heizer received the concerned telephone call from Hall, she went back to Combs's house to check on him. However, there was still no answer when Heizer knocked on Combs's front door. As a result, Heizer went to the back door of Combs's house and pushed out a piece of glass in the door so that she could get inside. When Heizer got inside the house, she saw Combs's body lying on the kitchen floor with blood everywhere. Heizer called 9-1-1 and reported that Combs had been killed.

{¶ 11} The responding officers observed that Combs had a pair of black-handled scissors shoved through his neck and a black leather belt wrapped tightly around his neck. The coroner who performed the autopsy on Combs's body testified that, in addition to the scissors in Combs's neck and the strangulation with the belt, Combs had a total of 56 sharp-force injuries to his body, i.e., 37 to his head and neck, 6 to his torso, and 13 to his upper extremities. The coroner also testified that the 56 sharp-force injuries were consistent with the assailant using a single-edged tool or the blades of scissors, as

many of the stab wounds were paired—meaning they were close in proximity. The coroner further testified that the belt was overtop of and intertwined with the scissors, which indicated that Combs had been stabbed with the scissors first and then strangled with the belt. The coroner opined to a reasonable degree of scientific certainty that Combs's cause of death was due to multiple sharp-force injuries and strangulation.

*Identification of Bierma as the Suspect*

{¶ 12} The investigating officers who responded to Combs's residence discovered that Combs's cell phone was missing. In an effort to locate Combs's cell phone, Major Angela Jackson of the Riverside Police Department requested an exigent circumstances cell phone "ping." The ping was successful and indicated that Combs's cell phone was at a residence on Saint Nicholas Street in Dayton, Ohio. Maj. Jackson responded to that residence, and she spoke with Irene Lewis and Irene's granddaughter, Alexandra Lewis. After speaking with Irene and Alexandra, Jackson learned that Irene's daughter, Jackie Wyatt, and Wyatt's friend, Sarah Bierma, lived at the residence with Irene. In addition, Jackson learned that Wyatt and Bierma had recently gone shopping at a nearby Goodwill.

{¶ 13} Around the time Maj. Jackson learned the foregoing information, she received an updated ping on Combs's cell phone indicating that the phone was located at a STEM school on Woodman Drive. Jackson knew that a Goodwill was located next to the STEM school, so another Riverside officer, Major Matthew Sturgeon, was dispatched to that area. Upon arriving, Maj. Sturgeon located a vehicle that matched the description of the vehicle that Wyatt and Bierma were said to be driving. Sturgeon

observed that the vehicle contained two female occupants, who were later identified as Wyatt and Bierma. When Sturgeon asked Bierma to identify herself, she told him that her name was Rosemary. Wyatt, however, provided Bierma's real name.

{¶ 14} During his encounter with Bierma, Maj. Sturgeon asked Bierma if she had a cell phone. While asking that question, Sturgeon noticed that Bierma had a cell phone shoved into the strap of the tank top that she was wearing. Bierma then removed the cell phone from her tank top and handed it to Sturgeon. Sturgeon confirmed that the cell phone belonged to Combs by having another officer dial Combs's number and observing the cell phone ring.

*Bierma's Interview with Detectives*

{¶ 15} After Maj. Sturgeon discovered that Bierma had Combs's cell phone, Bierma was detained and transported to the Riverside Police Department, where she was interviewed by Detectives Travis Abney and Adam Todd. The interview was video recorded and admitted into evidence as State's Exhibit 89. Prior to the interview, the detectives interacted with Bierma by asking her if she wanted anything to drink or eat, to which Bierma gave appropriate responses. After the interview began, and after Det. Abney told Bierma that he wanted to question her about the cell phone, Bierma suddenly changed her voice and started speaking with a southern accent. Bierma also identified herself as Quinn Greta Shaw and told the detectives that she was 114 years old.

{¶ 16} Det. Abney testified that he believed Bierma's false identification of herself was a manipulation tactic, and he decided to engage Bierma in conversation to determine

whether she was oriented to space and time. Abney did this by asking Bierma questions that would indicate whether she was aware of current events. For example, during a conversation about politics, Bierma was able to identify the current and previous United States presidents. After conversing with Bierma for some time, Abney believed that Bierma understood what was going on, and he proceeded to interview her about the cell phone in question.

{¶ 17} During the interview, Bierma initially told the detectives that she had obtained the cell phone from a sickly-looking man who she did not know. She claimed the man had driven up to her in his black pickup truck while she was walking on Xenia Avenue and randomly gave her the cell phone. Bierma claimed that she previously had a cell phone stolen from her and that she thought the man was returning her stolen phone.

{¶ 18} Bierma initially denied getting in the man's truck but later admitted to getting in the truck and riding to the man's house. Bierma told the detectives that she went with the man because he had offered to pay her to clean his house and to spend time with him. Bierma denied, however, that the man wanted sexual favors, as she claimed the man had told her that he could not have sex.

{¶ 19} In addition to asking her to clean his house, Bierma claimed that the man had asked her to kill him. Bierma told the detectives that the man had said that he wanted her to kill him because he had hurt her family and killed her daughter. Bierma told the detectives that she did not want to kill the man, but that he would not let her go until she did. Bierma told the detectives that the man eventually backed out from his desire to be killed, grabbed a pair of scissors, and struck her and fought with her. Bierma

said that she was able to get the scissors away from the man and stabbed him with the scissors multiple times, including in the front of the neck. She also told the detectives that she wrapped the man's belt around his neck while the man was still alive. Bierma claimed that the man was choking her while the scissors were in his neck and while she was wrapping the belt around his neck.

{¶ 20} Lastly, Bierma told the detectives that, after she had killed the man, she washed herself off in his bathroom, changed her clothes, took the cell phone he had given her, and then left his house, locking the door behind her. Bierma also told the detectives that she had burned her bloody clothes.

*Bierma's Physical Condition*

{¶ 21} Immediately following the interview with detectives, Bierma's entire body was photographed by a female evidence technician. The photographs of Bierma were admitted into evidence at trial as State's Exhibits 45-53. The evidence technician testified that Bierma had indicated that her left rib cage was hurt; however, no discoloration, bruising, lacerations, or other injury was observed to that part of Bierma's body. The photographic evidence taken during the examination only showed that Bierma had a few small areas of skin discoloration on her body. Specifically, the photos showed a pea-sized red spot on the far left side of Bierma's left breast near her armpit, State's Ex. 46-47; a small, faded bruise on the back of Bierma's left arm, State's Ex. 48; a small area of red discoloration and a small scab near the back of Bierma's left hip and top left buttocks, State's Ex. 49; a faint area of discoloration on the inside of Bierma's right

arm, State's Ex. 51; a small scab on Bierma's right forearm, State's Ex. 52; and some discoloration on the back of Bierma's legs and buttocks. The evidence technician who examined Bierma testified that Bierma did not complain of any pain in relation to the areas of discoloration. Overall, the photographic evidence showed no lacerations, fresh bruising, or other injuries to Bierma's body. In particular, there was absolutely no injury to Bierma's neck. State's Ex. 50.

*Bierma's Admission to Stacy White*

{¶ 22} In April 2023, Bierma was in the Montgomery County Jail awaiting trial. While in jail, Bierma was cellmates with Stacy White. White testified that while she and Bierma were cellmates, she had conversations with Bierma about why Bierma was in jail. From their conversations, White recalled Bierma telling her that the victim, who Bierma had not known, had picked Bierma up and took her to his house. White testified that Bierma had told her that after she arrived at the victim's house, she and the victim got into an argument over money and she stabbed the victim with a pair of scissors. White also testified that Bierma had told her that she stabbed the victim 37 times on the head and that she thereafter "strangled him with a belt to make sure that he was deceased[.]" Trial Tr. 385.

{¶ 23} White further testified that Bierma had described the scene as a "bloody mess" and admitted to taking the victim's cell phone. Trial Tr. 385. White claimed that Bierma had told her that she was found by the police because she used the victim's cell phone to listen to YouTube videos. In addition, White confirmed that Bierma had never

indicated that the victim attacked her in any way or had a weapon. Rather, Bierma told White that the victim was "fighting for his life" and was trying to take the scissors from her, but he could not. Trial Tr. 387.

{¶ 24} Continuing, White testified that she was shocked by the candor of Bierma's disclosure. According to White, Bierma was not upset by what she had done but laughed and claimed that she had enjoyed it. White explained that she voluntarily decided to make a "professional contact request" through the jail to report Bierma's statements because it bothered her that Bierma had laughed about taking another person's life. Trial Tr. 389-390, 413. White's professional contact request was admitted into evidence as State's Exhibit 90. White testified that she was not promised anything for reporting Bierma's statements.

*Jackie Wyatt's Trial Testimony*

{¶ 25} Wyatt testified that Bierma had been living on the front porch of her residence since May 2021. Wyatt told the investigating detectives that Bierma had left her residence on Saturday, June 19, and returned the next morning. Wyatt also told the detectives that when Bierma returned, she had no injuries or blood on her person and she had possession of a cell phone on which they had listened to music. Wyatt testified that Bierma did not have a cell phone before that day and that Bierma had told her that she had purchased the phone. Wyatt also claimed that Bierma had never mentioned anything to her about being in an altercation or being attacked by anyone.

*Bierma's Trial Testimony*

**{¶ 26}** Bierma testified that, on the day in question, she was walking on Xenia Avenue when a man in a black pickup truck, i.e., Combs, stopped and called out for her to approach him. Bierma testified that she did not know Combs but approached him anyway; she asked if he was lost or needed directions, to which Combs said no. Bierma claimed that Combs told her that he thought it looked like she could use some help and offered to hire her to clean his house. Bierma claimed that she accepted Combs's offer, got in his truck, and rode with him to his house.

**{¶ 27}** Bierma testified that when they arrived at Combs's house, they got out of his truck and went around to his back porch and drank some beer. Bierma claimed that Combs invited her inside his house after he finished his beer and after she had consumed about a quarter of hers. Bierma thereafter followed Combs into his house and went into the kitchen. While in the kitchen, Bierma saw Combs throw away his empty beer bottle and open up a new bottle using a pair of silver and black scissors.

**{¶ 28}** As Combs drank his second beer in the kitchen, he and Bierma began discussing Bierma's cleaning his house. Bierma testified that during that conversation, Combs kept repeating for her not to touch anything. Bierma claimed that Combs became short-tempered with her when she told him that she could not promise that she would not touch anything while cleaning. According to Bierma, Combs said that he would have to kill her if she touched anything. Bierma testified that Combs then got in her face and waived the scissors around while telling her not to touch anything.

**{¶ 29}** Continuing, Bierma testified that she tried to back away from Combs and

asked Combs to back up. Bierma testified that Combs then said: "I'm going to fucking kill you." Trial Tr. 604. Thereafter, Bierma claimed Combs said: "[Y]ou're going to kill me." *Id.* Confused by this statement, Bierma asked Combs why she would kill him. According to Bierma, Combs responded: "[B]ecause I killed your daughter." *Id.* Bierma testified that this made no sense to her and that she had realized Combs was "off his rocker." *Id.*

{¶ 30} Bierma testified that, after Combs continually instructed her to kill him, she asked if she could leave and started to go out the back door. Bierma claimed, however, that Combs grabbed her by her left arm, pulled her back in the house, and punched her in the ribs at least three times. Bierma claimed that after Combs punched her, he began choking her with two hands while he was still holding the scissors. Bierma asserted that Combs was choking her so hard that she saw white. Bierma fought with Combs and tried to get the scissors away from him. She claimed that they both fell on the floor as they were fighting for the scissors. According to Bierma, the scissors went through Combs's neck when they fell.

{¶ 31} Bierma testified that before she and Combs fell, and while Combs was choking her, she had managed to remove Combs's belt and placed it around his neck in an attempt to strangle him so that she could escape. Bierma also claimed that the belt tightened around Combs's neck when they fell. Bierma testified that, after they fell and after she saw the scissors in Combs's neck, she still considered Combs to be a threat and therefore continued to "use[ ] the belt to try to get away from him." Trial Tr. 611.

{¶ 32} Later in her testimony, Bierma also claimed that Combs had stabbed

*himself* in the head with the scissors 37 times and stabbed *himself* in the torso before she wrapped the belt around his neck. Despite that testimony, Bierma also claimed that after reading the coroner's report detailing Combs's multiple stab wounds, she was confused as to how Combs became so injured. Specifically, Bierma testified that she remembered being in a fight with Combs and his getting stabbed in the neck, but that she did not remember the other details.

{¶ 33} Bierma did, however, recall having blood all over her after the altercation. Bierma testified that she went into Combs's bathroom after the altercation to wash off and change into clean clothes. Bierma also testified that she put her bloody clothes in a plastic bag and then burned the bloody clothes in an alley. In addition, Bierma admitted to taking Combs's cell phone and using the phone to listen to music on YouTube. Bierma also confirmed that she never called 9-1-1 for help or sought any medical treatment herself.

{¶ 34} During Bierma's cross-examination, the State pointed out that Bierma no longer had the southern accent she spoke with during her interview with detectives. Bierma testified that the accent was gone because her throat had healed from Combs choking her. Bierma also claimed that while in jail with White she was crying, not laughing, about Combs's death. According to Bierma, she had told White that she was glad she was still alive and that it was Combs, not her, who was dead.

*The Verdict and Sentence*

{¶ 35} After considering all the evidence, the trial court rejected Bierma's claim of

self-defense and found Bierma guilty on all seven counts charged in the indictment. At sentencing, the trial court merged all the felonious assault and felony murder counts into a single conviction, and the State elected to have Bierma sentenced on the count of felony murder based on felonious assault with a deadly weapon. For that offense, the trial court ordered Bierma to serve 15 years to life in prison. In addition, the trial court ordered Bierma to serve a minimum of four years to a maximum of six years in prison for aggravated burglary, to run consecutively to the term imposed for felony murder. The trial court also imposed a minimum of four years to a maximum of six years in prison for aggravated robbery and 24 months in prison for tampering with evidence; those terms were to be served concurrently with the prison terms imposed for felony murder and aggravated burglary. Accordingly, Bierma was sentenced to an aggregate term of 19 years to life in prison.

{¶ 36} Bierma now appeals from her convictions, raising two assignments of error for review.

## First Assignment of Error

{¶ 37} Under her first assignment of error, Bierma contends that the trial court erred by failing to merge her convictions for aggravated burglary and felony murder on grounds that they are allied offenses of similar import under R.C. 2941.25. We disagree.

*Standard of Review*

{¶ 38} An appellate court typically reviews a trial court's merger determination de

novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28. However, because Bierma failed to object to the trial court's merger determination at sentencing, all but plain error has been waived for appeal on that issue. *State v. Bailey,* 171 Ohio St.3d 486, 2022-Ohio-4407, 218 N.E.3d 858, ¶ 7, citing *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 28. Accordingly, we will review the trial court's merger determination for plain error.

{¶ 39} "To establish plain error, [Bierma] must show that an error occurred, that the error was obvious, and that there is 'a reasonable probability that the error resulted in prejudice,' meaning that the error affected the outcome of the trial." (Emphasis omitted.) *State v. McAlpin*, 169 Ohio St.3d 279, 2022-Ohio-1567, 204 N.E.3d 459, ¶ 66, quoting *Rogers* at ¶ 22. *Accord Bailey* at ¶ 8. These elements are "conjunctive," meaning "all three must apply to justify an appellate court's intervention." *Bailey* at ¶ 9, citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Intervention by an appellate court for plain error "is warranted only under exceptional circumstances to prevent injustice." *Id.* at ¶ 8, citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 40} In the past, this court has stated on various occasions that a trial court's failure to merge allied offenses of similar import at sentencing constitutes plain error. *See, e.g., State v. Hodge*, 2d Dist. Montgomery No. 29147, 2022-Ohio-1780, ¶ 44; *State v. King*, 2d Dist. Montgomery No. 29137, 2021-Ohio-4229, ¶ 28; *State v. Shoecraft*, 2d Dist. Montgomery No. 27860, 2018-Ohio-3920, ¶ 56; *State v. Rogers*, 2d Dist. Greene No. 2011-CA-57, 2012-Ohio-4451, ¶ 5; *State v. Fairman*, 2d Dist. Montgomery No. 24299,

2011-Ohio-6489, ¶ 56. More recently, however, we have recognized that the Supreme Court of Ohio has indicated that the failure to merge allied offenses does not automatically constitute plain error. *See, e.g., State v. Morris,* 2d Dist. Montgomery No. 29555, 2023-Ohio-1765*, ¶* 24; *State v. Hess*, 2d Dist. Champaign No. 2022-CA-24, 2023-Ohio-3658, ¶ 11, citing *Bailey*.

{¶ **41**} In *Bailey*, 171 Ohio St.3d 486, 2022-Ohio-4407, 218 N.E.3d 858, the Supreme Court of Ohio explained that "the law governing the merger of allied offenses is dependent on the specific facts of each case[,]" and that the allied offense analysis "can lead to exceedingly fine distinctions" since it "turns on an analysis of the facts[.]" (Citations omitted.) *Id.* at ¶ 16 and ¶ 11. With that in mind, the Supreme Court held that even if the trial court in *Bailey* had erred by failing to merge the offenses in question, "the facts of the case indicate[d] that such an error was not obvious" and therefore did not amount to plain error. *Id.* at ¶ 14-16. Accordingly, *Bailey* indicates that "the proper standard is not that failure to merge allied offenses 'is' plain error[,]" but rather it " 'may' be plain error, depending on the circumstances." *Morris* at ¶ 27.

*Allied Offense Analysis*

{¶ **42**} The Double Jeopardy Clause of the United States Constitution protects against multiple punishments for the same criminal conduct. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 10. When a defendant's conduct supports multiple offenses, sentencing courts apply the allied offense analysis in R.C. 2941.25 to

determine whether the offenses merge or whether the defendant may be convicted of separate offenses.

**{¶ 43}** R.C. 2941.25 provides that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶ 44}** "[W]hen determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions * * *: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?" *Ruff* at ¶ 31. "An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered." *Id.*

*Offenses at Issue*

**{¶ 45}** As previously discussed, the offenses at issue in this case are aggravated burglary in violation of R.C. 2911.11(A)(1) and felony murder as a proximate result of

felonious assault with a deadly weapon in violation of R.C. 2903.02(B) and R.C. 2903.11(A)(2).

{¶ 46} The aggravated burglary statute provides that: "No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense if * * * (1) [t]he offender inflicts, or attempts or threatens to inflict physical harm on another."   R.C. 2911.11(A)(1).

{¶ 47} The felony murder statute provides that: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]"   R.C. 2903.02(B). Again, the underlying offense of violence to Bierma's felony murder was felonious assault with a deadly weapon in violation of R.C. 2903.11(A)(2), which provides that: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * *by means of a deadly weapon or dangerous ordnance."   R.C. 2903.11(A)(2).

{¶ 48} The term "physical harm" as used in the aggravated burglary and felonious assault statutes means "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).   The term "deadly weapon" as used in the felonious assault statute is defined as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."   R.C. 2903.11(E)(1); 2923.11(A).[1]

---

[1] We note that "[a]n instrument, no matter how innocuous when not in use, is a deadly weapon within the definition of R.C. 2923.11(A) when it is of sufficient size and weight to inflict death upon a person and when the instrument is wielded or threatened to be wielded against the body of the person."   *State v. Deboe*, 62 Ohio App.2d 192, 406 N.E.2d 536

*The Offenses are Dissimilar in Import*

**{¶ 49}** Offenses are dissimilar in import or significance within the meaning of R.C. 2941.25(B) "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff,* 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, at ¶ 23. Therefore, "a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense." *Id.* at ¶ 26.

**{¶ 50}** Bierma argues that this court's decision in *State v. Ramey,* 2d Dist. Montgomery No. 27636, 2018-Ohio-3072, supports finding that her aggravated burglary and felony murder offenses were *similar* in import on grounds that the physical harm associated with her aggravated burglary offense was the same physical harm associated with the felonious assault underlying her felony murder offense.

**{¶ 51}** In *Ramey,* the appellant trespassed in the victim's home to retrieve $300 that he believed the victim stole from him. *Id.* at ¶ 4-5. When the appellant entered the

---

(6th Dist.1977). "The manner of use or threatened use of the instrument, and the nature of the instrument, determine its capability to inflict death." *Id. Accord State v. Ford,* 2d Dist. Montgomery No. 14389, 1995 WL 19114, *2 (Jan. 18, 1995); *State v. Schooler,* 2d Dist. Montgomery No. 19627, 2003-Ohio-6248, ¶ 21; *State v. Portis,* 2d Dist. Montgomery No. 28677, 2021-Ohio-608, ¶ 39. For example, a belt can satisfy the definition of "deadly weapon" under circumstances where it is squeezed around a victim's neck. *See State v. Breeden,* 8th Dist. Cuyahoga No. 84663, 2005-Ohio-510, ¶ 61. A pair of scissors can also qualify as a deadly weapon. *See State v. Whatley,* 1st Dist. Hamilton No. C-150471, 2016-Ohio-5713, ¶ 13; *State v. Hayes,* 5th Dist. Knox No. 95 CA 40, 1996 WL 488544, *2 (May 2, 1996).

victim's home, the pair began physically fighting and the appellant ended up on top of the victim with his hands around the victim's throat and his knees on the victim's arms. During the altercation, the victim eventually stopped moving and the appellant thereafter left the scene. *Id.* at ¶ 5. The police later found the victim's dead body on the living room floor. *Id.* at ¶ 6. An autopsy revealed that the victim had injuries to his neck, as well as hemorrhages in his eyes that were consistent with strangulation. *Id.* at ¶ 7.

**{¶ 52}** Following a jury trial, the appellant in *Ramey* was convicted of aggravated burglary and felony murder as a proximate result of felonious assault. *Id.* at ¶ 8. On appeal, the appellant argued that his aggravated burglary and felony murder convictions should have merged because both offenses were based on the same felonious assault. *Id.* at ¶ 11. In analyzing that issue, this court cited *State v. Ruff*, 1st Dist. Hamilton Nos. C-120533, C-120534, 2015-Ohio-3367 (*Ruff II*), wherein the First District Court of Appeals interpreted the Supreme Court of Ohio's decision in *Ruff* to mean that: "where the conduct that constitutes one offense causes a harm that is not separate and identifiable from the harm caused by the aggravating element of another offense, then the offenses are of a similar import." *Ruff II* at ¶ 18. Using that principle, we concluded the following in *Ramey*:

> Ramey's conduct constituting one offense ([the victim's] murder as a proximate cause of felonious assault), caused a harm that is not separate and identifiable from the harm caused by the aggravating element of another offense (aggravated burglary). In other words, the murder as a proximate cause of felonious assault is the aggravating element necessary

to make the burglary an aggravated burglary rather than a simple burglary. Without the physical harm caused by the felonious assault, the burglary would not have had the aggravating element of inflicting physical harm. Accordingly, we conclude that the trial court erred by failing to merge the offense of aggravated burglary with the offense of murder as a proximate cause of felonious assault.

*Ramey* at ¶ 21.

**{¶ 53}** As previously discussed, Bierma contends that *Ramey* is analogous to the instant case because she claims that the physical harm associated with her aggravated burglary offense was the same physical harm associated with the felonious assault underlying her felony murder offense. The State, however, argues that the trial court could have found that Bierma's aggravated burglary and felony murder offenses resulted in separate, identifiable harms due to the evidence establishing that Bierma had inflicted several non-fatal stab wounds on Combs's body before she shoved the scissors into his neck and before she strangled him with his belt. That is, the State maintains that the non-fatal stab wounds fulfilled the physical harm required for aggravated burglary, while the stab wound to the neck and/or the subsequent strangulation fulfilled the physical harm required for felony murder/felonious assault with a deadly weapon.

**{¶ 54}** We note that multiple courts have rejected arguments similar to the State's on grounds that there was nothing in the record to distinguish between non-fatal and fatal wounds. *See, e.g., State v. Anthony*, 2015-Ohio-2267, 37 N.E.3d 751 (8th Dist.); *State v. Hair*, 6th Dist. Lucas No. L-22-1164, 2023-Ohio-2422, ¶ 71; *State v. Craig*, 4th Dist.

Athens No. 15CA22, 2017-Ohio-4342, ¶ 24. However, that is not the case here.

{¶ 55} In this case, the coroner testified that Combs had 56 sharp-force injuries on his body that were consistent with the assailant's use of scissors. Trial Tr. 456, 481. The coroner testified that those injuries were inflicted during the time frame while Combs was still alive and that they were fairly superficial, albeit they caused small defects on Combs's skull. Trial Tr. 457, 459-460, 463, 478, 481-482. In addition to the sharp-force injuries, the coroner testified that a pair of scissors was inserted through the front of Combs's neck causing the deepest wound, which was five and one-eighth inches deep. Trial Tr. 447, 463. The coroner testified that the scissors passed through the skin, soft tissues, and muscle of the neck, and then into the thyroid gland, vocal cords, and the posterior laryngeal pharynx. Trial Tr. 463. The coroner also testified that the scissors injured the right and left jugular veins and the left common carotid artery and noted that those injuries would have resulted in significant bleeding and the inability to speak and breathe. Trial Tr. 464, 467-468. The coroner further testified that the internal bleeding caused by the injuries to the throat would have caused Combs to choke on blood. Trial Tr. 468.

{¶ 56} In addition to the sharp-force injuries and the deep stab wound to the neck, the coroner testified that Combs had a belt wrapped tightly around his neck. Trial Tr. 447, 453. The coroner explained that the belt was located on top of and intertwined with the scissors' handles, and that this positioning indicated that the scissors had been inserted through Combs's neck before the belt was wrapped around the neck. Trial Tr. 448-449. *See also* State's Ex. 63. The coroner also testified that Combs had injuries

called petechiae on his eyes and face that were caused by increased blood pressure in the head, which is an indicator of asphyxia and choking. Trial Tr. 453-454. The coroner explained that such injuries are consistent with strangulation. Trial Tr. 454.

{¶ 57} Based on the coroner's testimony and the fact that the scissors were left in Combs's neck, the trial court could have determined that the superficial, sharp-force injuries on Combs's body were inflicted prior to the deep neck wound and prior to the strangulation with Combs's belt. Such a finding was also supported by White's testimony, which indicated that Bierma had admitted to stabbing Combs in the head multiple times with scissors before strangling him with his belt to make sure he was dead.

{¶ 58} In *State v. Asbury*, 11th Dist. Trumbull No. 2016-T-0052, 2017-Ohio-1005, the appellant was convicted of felonious assault and attempted murder due to his strangling the victim until she was unconscious and then stabbing the victim five times. *Id.* at ¶1-9. On appeal, the appellant argued that the trial court erred by failing to merge the felonious assault and attempted murder offenses at sentencing. *Id.* The Eleventh District Court of Appeals, however, disagreed and found that:

> The evidence in this case demonstrates that appellant's act of strangulation and the stabbing were of dissimilar import insofar as they caused separate harm to [the victim]. The act of strangulation caused [the victim] to lose consciousness, while the multiple stab wounds left deep gashes in her flesh causing her to bleed profusely; while the former arguably facilitated the latter, the harm is fundamentally distinguishable.

*Id.* at ¶ 28.

{¶ 59} A similar analysis can be applied to the instant case. Specifically, the coroner's testimony indicates that the initial, superficial stab wounds caused separate harm in that they would have "bled some, but not as nearly as much as would have come from the jugular or the carotid." Trial Tr. 482. In contrast, the coroner testified that the deep stab wound through the neck injuring the jugular veins and the carotid artery would have caused significant bleeding, the inability to speak and breathe, and choking on blood. The coroner also testified that the subsequent strangulation would have caused asphyxia and choking as well. Because the superficial, sharp-force injuries to the victim's body would not have caused the same significant amount of blood loss and choking as was caused by the deep stab wound to the neck and the strangulation, the trial court could have found that the superficial stab wounds and the deep stab wound/strangulation constituted separate, identifiable harms. In other words, it could be determined from the evidence that the physical harm occasioned by the initial sharp-force injuries was separate from and not as severe as the stab wound to the neck and the strangulation with the belt.

{¶ 60} Based on the foregoing analysis, we find that the trial court could have found that the initial, superficial stab wounds constituted the physical harm required for the aggravated burglary offense and that the deep stab wound to Combs's neck and/or his subsequent strangulation with the belt constituted the physical harm required for the felonious assault underlying the felony murder offense. Therefore, the trial court could have concluded that the offenses were dissimilar in import in that they resulted in separate, identifiable harms and thus were not allied offenses that merged. The trial

court also could have found that the theft of Combs's cell phone by Bierma was a separate, identifiable harm occasioned by the aggravated burglary. *See State v. Roberson*, 2018-Ohio-1955, 113 N.E.3d 204 (6th Dist.). However, under that scenario, the trial court would have been required to merge the aggravated burglary and aggravated robbery offenses. Regardless, the evidence pertaining to the nature of the victim's injuries and how they were inflicted establishes that the trial court could have concluded that the aggravated burglary and felony murder offenses were dissimilar in import in that they caused separate, identifiable harms. While we see no issue with this conclusion, even if another court were to disagree, such a conclusion would not amount to an obvious error that warrants a finding of plain error.

*The Offenses were Committed Separately*

{¶ 61} Offenses are committed separately within the meaning of R.C. 2941.25(B) if "one offense was complete before the other offense occurred, * * * notwithstanding their proximity in time and that one [offense] was committed in order to commit the other." *State v. Turner*, 2d Dist. Montgomery No. 24421, 2011-Ohio-6714, ¶ 24. *Accord State v. Margiotti*, 10th Dist. Franklin No. 19AP-469, 2021-Ohio-1826, ¶15-16; *State v. Spurrier*, 11th Dist. Lake No. 2020-L-069, 2021-Ohio-1061, ¶ 68. In other words, "when one offense is completed prior to the completion of another offense during the defendant's course of conduct, those offenses are separate acts." *State v. Mooty*, 2014-Ohio-733, 9 N.E.3d 443, ¶ 49 (2d Dist.).

{¶ 62} Here, the evidence establishes that Bierma's aggravated burglary and

felony murder offenses were committed by separate acts. As for the aggravated burglary, when Bierma became violent with Combs and began physically attacking him inside his residence, she lost any privilege she may have had to be there. *See State v. Steffen*, 31 Ohio St.3d 111, 115, 509 N.E.2d 383 (1987). This turned Bierma's presence into the requisite trespass with intent to commit a criminal offense in Combs's residence. The aggravated element of the offense, i.e., causing Combs's physical harm, was satisfied when she began stabbing Combs. At that point, the aggravated burglary had been completed.

{¶ 63} After the completion of the aggravated burglary, Bierma shoved the scissors into Combs's neck and then strangled Combs with his belt, killing him. Therefore, although committed close in time, there is evidence indicating that Bierma's felony murder offense was committed separately from her aggravated burglary offense, meaning that those offenses were not allied offenses that merged. Again, even if another court were to disagree with this conclusion, it would not amount to an obvious error that warrants a finding of plain error.

{¶ 64} Bierma's first assignment of error is overruled.

**Second Assignment of Error**

{¶ 65} Under her second assignment of error, Bierma claims that the trial court's decision finding that the State had satisfied its burden to disprove her self-defense claim beyond a reasonable doubt was against the manifest weight of the evidence. We disagree.

{¶ 66} R.C. 2901.05(B)(1) governs the burden and degree of proof required for the affirmative defense of self-defense and provides that:

A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

R.C. 2901.05(B)(1).

{¶ 67} The foregoing statute "places the initial burden of producing evidence 'that tends to support' a self-defense claim on the defendant." *State v. Bowen*, 2d Dist. Montgomery No. 29833, 2024-Ohio-1079, ¶ 11. " '[I]f the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden.' " *State v. Palmer*, Ohio Slip Opinion No. 2024-Ohio-539, __ N.E.3d __, ¶ 20, quoting *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, 216 N.E.3d 653, ¶ 25. "This burden of production is 'not a heavy one and * * * might even be satisfied through the state's own evidence.' " *Id.*, quoting *Messenger* at ¶ 22. (Other citation omitted.).

{¶ 68} Once the defendant puts forth sufficient evidence that he or she was acting

in self-defense, the burden then shifts to the State to prove that the defendant did not act in self-defense. *Bowen* at ¶ 12, citing *Messenger* at ¶ 19. "To accomplish this, the State must disprove beyond a reasonable doubt at least one of the elements of self-defense." *Id.*, citing *State v. Gutierrez-Reynoso*, 11th Dist. Lake No. 2022-L-130, 2023-Ohio-3122, ¶ 72.

{¶ 69} The elements of a self-defense claim are: " '(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.' " *Messenger* at ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002). We note that "[f]ollowing a recent amendment to R.C. 2901.09(B), 'a person has no duty to retreat before using force in self-defense * * * if that person is in a place in which the person lawfully has a right to be.' " *Palmer* at ¶ 23, citing R.C. 2901.09(B); 2020 Am.S.B. No. 175.

{¶ 70} The state's burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal. *Messenger* at ¶ 27; *State v. Knuff*, Ohio Slip Opinion No. 2024-Ohio-902, __ N.E.3d __, ¶ 208. "A reviewing court considering a manifest-weight claim 'review[s] the entire record, weighs the evidence and all reasonable inferences, [and] considers the credibility of witnesses.' " *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 77, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The question for

the reviewing court is 'whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.*, quoting *Martin*; *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Reversing a conviction under a manifest weight theory "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

### *The Not-at-Fault Element of Self-Defense*

{¶ 71} "In order to satisfy the 'not-at-fault' requirement the defendant must not have been the first aggressor in the incident." *State v. Kucharski*, 2d Dist. Montgomery No. 20815, 2005-Ohio-6541, ¶ 27, citing *State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979); *State v. Turner*, 171 Ohio App.3d 82, 2007-Ohio-1346, 869 N.E.2d 708, ¶ 23 (2d Dist.). In addition, "a person cannot continue to use force against the original aggressor once the imminent danger of death or serious bodily injury dissipates; the defender cannot become the aggressor." *In re C.L.*, 197 Ohio App.3d 514, 2011-Ohio-6892, 968 N.E.2d 34, ¶ 24. That is, " 'the defense of self-defense does not permit the alleged victim to become the aggressor once the affray has ended, or before an affray has even taken place.' " *State v. Santana*, 2d Dist. Montgomery No. 29348, 2022-Ohio-4118, ¶ 32, quoting *State v. Perez*, 7th Dist. Mahoning No. 09 MA 30, 2010-Ohio-3168, ¶ 17.

{¶ 72} In this case, White's testified that Bierma told her that she began stabbing Combs after they had an argument over money, that Combs never attacked her or had a weapon, and that Combs was "fighting for his life." Trial Tr. 387. This indicated that

Bierma was the initial aggressor. The sheer number of stab wounds inflicted on Combs, some of which were described as defensive in nature, i.e., on the back of the forearms from shielding an attack, Trial Tr. 464, also indicated that Bierma, not Combs, was the aggressor. The fact that Bierma had no cuts on her body or any significant injury further indicated that she was the aggressor. Although Bierma testified that Combs had punched her in the ribs multiple times and choked her, the photographic evidence presented at trial established that there were absolutely no marks or injuries to the area of Bierma's ribs or neck.

{¶ 73} Even if the trial court had believed Bierma's testimony that Combs was the original aggressor, the evidence indicated that Bierma eventually became the aggressor when she decided to strangle Combs with his belt *after* he had been stabbed in the neck. In other words, instead of escaping to safety after Combs was stabbed in the neck and likely no longer a threat, Bierma decided to go on the offensive and strangle him to death.

{¶ 74} We also find it significant that Bierma's actions after the altercation strongly suggested a consciousness of guilt. For example, there was no dispute that, despite having access to Combs's cell phone, Bierma did not call for help or report the altercation. Instead, Bierma admitted that she washed herself off in Combs's bathroom, changed into clean clothes, burned her bloody clothes, and took Combs's cell phone. The evidence also established that Bierma did not tell her friend Wyatt or the police that she had been attacked. These actions all supported the notion that Bierma knew she was in the wrong and was covering her tracks, which also tended to suggest that she was the aggressor.

{¶ 75} For the foregoing reasons, we find that the State presented sufficient

evidence disproving the not-at-fault element of self-defense, which alone warranted rejecting Bierma's self-defense claim.

*The Bona-Fide-Belief Element of Self-Defense*

{¶ 76} The bona-fide-belief element of self-defense " ' "requires consideration of the force that was used in relation to the danger the accused believed he was in." ' " *State v. Barker*, 2022-Ohio-3756, 199 N.E.3d 626, ¶ 28 (2d Dist.), quoting *State v. Rothermel*, 2d Dist. Montgomery No. 26004, 2014-Ohio-3168, ¶ 14, quoting *State v. Bayes*, 2d Dist. Clark No. 2000-CA-32, 2000 WL 1879101, *4 (Dec. 29, 2000). *Accord State v. Trigg*, 2d Dist. Montgomery No. 29637, 2023-Ohio-3660, ¶ 31. "It is well established that a person may only use 'that force which is reasonably necessary to repel the attack.' " *Barker* at ¶ 28, quoting *State v. Paschal*, 2d Dist. Montgomery No. 18262, 2001 WL 395354, *2 (Apr. 20, 2001), quoting *State v. Williford*, 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990). "If the force used was so disproportionate that it shows a purpose to injure, self-defense is unavailable." *Id.*, citing *State v. Wallace-Lee,* 2d Dist. Greene No. 2019-CA-19, 2020-Ohio-3681, ¶ 43.

{¶ 77} The bona-fide-belief element "is a combined subjective and objective test." *State v. Thomas*, 77 Ohio St.3d 323, 330, 673 N.E.2d 1339 (1997). As we explained in *State v. Wheatley*, 2d Dist. Montgomery No. 17808, 2000 WL 145394 (Feb. 11, 2000):

The trier-of-fact "first must consider the defendant's situation objectively, that is, whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history,

and conditions at the time of the attack, she *reasonably* believed she was in imminent danger." [*Thomas* at 330.] (Emphasis sic.) "Then, if the objective standard is met, the jury must determine if, subjectively, this particular defendant had an *honest* belief that she was in imminent danger." *Id.* at 331, 673 N.E.2d 1339. (Emphasis sic.) Thus, "self defense 'is placed on the grounds of the *bona fides* of defendant's belief, and reasonableness therefor, and whether, under the circumstances, he exercised a careful and proper use of his own faculties.' (Emphasis sic.)" *Id.*, quoting [*State v. Sheets*, 115 Ohio St. 308, 310, 152 N.E. 664 (1926)]. *Wheatley* at *4.

{¶ 78} In this case, Bierma claims that the trial court should have taken her mental illness, schizophrenia, into account when determining whether the State had proved beyond a reasonable doubt that she did not have a bona fide belief that she was in imminent danger of death or great bodily harm that necessitated the use of deadly force to escape. According to Bierma, the trial court should have concluded that it was objectively reasonable for her, a person with schizophrenia, to believe that Combs was trying to kill her and for her to react the way she did.

{¶ 79} Although it is appropriate to consider a defendant's particular characteristics and conditions when analyzing the bona-fide-belief element of self-defense, in this case, other than Bierma's briefly mention that she was "schizophrenic" over objection during her testimony, Trial Tr. 619, there was absolutely no evidence of her diagnosis presented at trial. That is, no doctor or other medical professional testified regarding her alleged

condition and no medical records were admitted into evidence. Accordingly, it would have been inappropriate for the trial court to consider her alleged schizophrenia when rendering its decision.

{¶ 80} Based on the information presented at trial, and even considering Bierma's strange conduct throughout the proceedings, we do not find that it would have been a manifest miscarriage of justice for the trial court to conclude that the State proved that Bierma did not have a bona fide belief that she was in imminent danger of death or great bodily harm that necessitated the use of deadly force. We reach this conclusion because there is no credible evidence indicating that Combs did anything that would have given Bierma a reasonable belief that he was going to kill her.

{¶ 81} Bierma's failure to report Combs's alleged attack and White's testimony indicating that Bierma never mentioned Combs's attacking her or having a weapon disproves the notion that Bierma believed that she was in imminent danger of death or great bodily harm at the hands of Combs. Also, the excessive amount of times Bierma stabbed Combs and Bierma's act of staying at the scene and strangling Combs after he had been stabbed in the neck suggested that Bierma was not acting in fear but acting with an intent to injure and/or kill. As previously discussed, Bierma was only permitted to use force that was necessary to repel Combs's alleged attack, and the trial court could have reasonably determined that stabbing Combs 56 times, inserting scissors into his neck, and strangling him with a belt was excessive.

{¶ 82} For all the foregoing reasons, we find that the trial court did not lose its way and create a manifest miscarriage of justice by rejecting Bierma's self-defense claim.

Accordingly, the trial court's decision finding that the State had disproved Bierma's self-defense claim was not against the manifest weight of the evidence.

{¶ 83} Bierma's second assignment of error is overruled.

## Conclusion

{¶ 84} Having overruled both assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, P.J., concurs.

TUCKER, J., concurs:

{¶ 85} I concur in the majority opinion's resolution of both assignments of error.   I write separately to add my thoughts regarding the merger assignment of error.

{¶ 86} When, as here, a court must grapple with whether merger is required when a defendant's conduct constituting one offense (here felony murder) arguably caused a harm that is not separate and identifiable from the harm caused by the aggravating element of another offense (here aggravated burglary), the analysis can be particularly fact sensitive and nuanced.   This difficulty occurs because in *Ruff,* 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, the Supreme Court concluded that, in this situation, merger of the two offenses is neither categorically rejected nor required.   *Id.* at ¶ 26.

{¶ 87} As discussed in the majority opinion, upon the Supreme Court's remand of *Ruff*, the First District concluded that, "where the conduct that constitutes one offense

causes a harm that is not separate and identifiable from the harm caused by the aggravating element of another offense, then the offenses are of similar import." *Ruff II,* 1st Dist. Hamilton Nos. C-120533, C-120534, 2015-Ohio-3367, at ¶ 18. In my view, this conclusion provides an answer to the merger question in some, but not all, cases. This is so because I reject the notion expressed in *Ruff II* that *Ruff* created an "implicit" but seemingly absolute rule that whenever the harm caused by one offense is the aggravating element of another offense, the two offenses are always allied offenses of similar import. *Ruff II* at ¶ 16.

{¶ 88} In my opinion, *Ramey,* 2d Dist. Montgomery No. 27636, 2018-Ohio-3072, presents a factual situation for which *Ruff II* provides the analytical framework to reach an appropriate merger conclusion. In *Ramey*, the trial court instructed the jury that, in order to find Ramey guilty of aggravated burglary, Ramey "must have trespassed [in the victim's home] with the 'purpose' to commit the criminal offense of Felonious Assault and/or Aggravated Assault[,] [and] [t]he jury, by its verdict, concluded that Ramey had trespassed to commit the crime of Felonious Assault." *Id.* at ¶ 21. Moreover, the State's theory, as reflected by its closing argument, was that when Ramey trespassed in the victim's home, he did so with the purpose to commit felonious assault. *Id.* The record established only two harms: Ramey's trespass into the home and the felonious assault which resulted in the victim's death. Under these facts, consistent with *Ruff* and *Ruff II*, the felony murder and the aggravating infliction of harm element of the aggravated burglary did not cause a separate, identifiable harm, they were not committed separately, and they were committed with the same animus. Thus, the offenses were allied offenses

of similar import.

{¶ 89} As discussed in the majority opinion, the Sixth District Court of Appeals weighed in on this issue in *Roberson,* 2018-Ohio-1955, 113 N.E.3d 204. In that case, the defendant was convicted of rape and aggravated burglary, among other offenses, following a jury trial. The trial court did not merge those two offenses, without objection. Of importance, the evidence, though conflicting, indicated that Roberson stole certain items from the victim's home in addition to committing the rape, but he was not indicted for this conduct. On appeal, Roberson, pointing to *Ruff II*, argued that because the harm caused by the rape was the same as the burglary's aggravating element harm, the two offenses should merge. *Roberson* at ¶ 26. In response, the Sixth District first stated its disagreement with *Ruff II*'s conclusion that the Supreme Court's *Ruff* opinion had established an implicit rule that merger was required "whenever one crime results in multiple 'separate and identifiable' harms *but* one of those harms is the aggravating circumstance of the other crime." (Emphasis sic.) *Roberson* at ¶ 26, quoting *Ruff II* at ¶ 16. The Sixth District, on the other hand, also recognized the Supreme Court's conclusion in *Ruff* that a defendant's trespass into the victim's home "that results from [every] aggravated burglary is not a separate harm that is sufficient to support a finding of dissimilar import on its own – otherwise, aggravated burglary would always be a crime of dissimilar import to another offense * * *." *Id.* at ¶ 27. Given the absence of any categorical rule, the Sixth District noted that the theft of the victim's property – though not indicted conduct – "was an additional harm that resulted from the aggravated burglary * * * and this harm is separate and identifiable from the physical harm that resulted from

the rape." *Id.* Thus, the Sixth District concluded that the two offenses were dissimilar in import because the aggravated burglary resulted in harm to the victim that was " 'separate and identifiable' from the harm that resulted from the rape." *Id.*

**{¶ 90}** Based upon the discussed case law, it first seems to me that when analyzing whether an aggravated burglary offense merges with another offense committed during the course of the aggravated burglary, the harm caused by the trespass into the home is not part of the analysis. Next, if the burglary's physical harm aggravating element is the only other harm the victim sustained, merger of the aggravated burglary and the other offense (i.e. felony murder) is required. But, and finally, if the aggravated burglary caused another harm, the aggravated burglary and the other offense are not allied offenses of similar import.

**{¶ 91}** Turning, then, to Bierma's case, the theft of Combs's cell phone, though indicted as aggravated robbery, was nonetheless a separate, identifiable harm caused by the aggravated burglary. Consistent with *Roberson*, this was a sufficient basis to conclude that the aggravated burglary and felony murder offenses were not subject to merger. And, under a plain error standard of review, I concur in the remaining allied offense reasoning and conclusions set forth in the majority opinion.